No. 80-149

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

VANESSA ESLINGER and LANETTE ESLINGER,
individually and as Co-Personal Representatives
of Estate of Walter and Clare Eslinger,

Plaintiffs and Appellants,

vs.

RINGSBY TRUCK LINES, INC., and STATE
OF MONTANA,

Defendants and Respondents.

---

Appeal from:   District Court of the Fourth Judicial District,
In and for the County of Missoula
Hon. James Wheelis, Judge presiding.

Counsel of Record:

For Appellants:

Morrison Law Offices, Missoula, Montana
Carey Matovich argued and Joan Jonkel argued, Missoula,
Montana

For Respondents:

Garlington, Lohn and Robinson, Missoula, Montana
Gary Graham argued, and Paul Meismer argued, Missoula,
Montana
J. Michael Young, Dept. of Administration, Helena,
Montana

---

Submitted:   September 18, 1981
Decided:   NOV 12 1981

Filed:   NOV 12 1981

Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is a wrongful death action in which plaintiffs appeal from a final judgment and denial of their motion for a new trial of the District Court of the Fourth Judicial District, following a jury verdict which found plaintiffs' decedent 100 percent negligent and defendants Ringsby Truck Lines and the State of Montana to be free of any negligence. Plaintiffs appeal as to Ringsby Truck Lines only.

Walter and Claire Eslinger were killed when a truck belonging to Ringsby Truck Lines collided with the Eslinger automobile. The truck was driven by an employee, Howard Skiles. The accident occurred at 12:15 p.m., January 18, 1978, on Highway 93 at Ravalli, Montana. The roadway was snow covered and slick; the temperature was between 20 and 25 degrees Fahrenheit.

The collision occurred near the T-junction formed by U.S. Highway 93 and Montana Highway 200. Highway 93 is straight and relatively flat through Ravalli but changes as the highway proceeds north up Ravalli Hill. The Bison Cafe is located on Highway 93, directly adjacent to the accident site. Several witnesses were in the cafe and testified regarding the accident.

Walter Eslinger was driving his 1967 Chevrolet down Ravalli Hill in the southbound lane of U.S. Highway 93. Claire Eslinger was his passenger. At the same time, Howard Skiles was driving a 1973 Mack trailer-tractor combination in the northbound lane of Highway 93. As the Chevrolet came down the hill and crossed the junction, snow-packed ruts at the intersection caused the car to fishtail. The parties differ sharply from this point in their theories of the

-2-

subsequent events.

Appellants claimed Eslinger regained control; however, the driver of the Ringsby truck abruptly locked his brakes and lost control of his vehicle. The trailer jack-knifed and the truck skidded across the centerline into the southbound lane and the Eslinger vehicle. According to appellants, the direct and proximate cause of the collision and the wrongful deaths of the Eslingers was the negligence of the truck driver in failing to (1) keep a proper lookout; (2) maintain reasonable control of the truck; (3) yield one half of the roadway; and (4) operate at a reasonable speed.

Respondent Ringsby claimed that Eslinger lost control of his vehicle at the intersection and skidded head-on into the truck's proper lane. An integral part of Ringsby's theory was the emergency created for the Ringsby driver when Eslinger's vehicle began to fishtail. Ringsby claimed the momentary application of the truck's brakes was an appropriate response to a perilous situation. The emergency instruction given was therefore proper.

Howard Skiles, the truck driver, did not appear at trial. His testimony was entered by deposition.

Several witnesses testified that the Eslinger vehicle was fishtailing prior to the accident. The truck driver's testimony by deposition of his perceptions and actions is relevant to the use of the sudden emergency doctrine. Driver Skiles testified he was familiar with the road and aware of the icy, unsanded conditions. He further testified:

"Q. Could you pinpoint for us just how far away the vehicle was when you first saw it?
A. Well, no, I can't.

"Q. Could you estimate it perhaps in car lengths? A. Not really. I seen him coming

-3-

down the hill before he ever got to the junction. I didn't pay that much attention to him until he got within one hundred yards of me. [Emphasis added.]

"Q. So was he on the straightaway when you first began to pay attention to him? A. Yes.

"Q. How long is your rig? Could you estimate that? A. It is approximately sixty-eight feet overall.

"Q. Does that include both trailers? A. Yes.

"Q. Could you describe the vehicle that you saw coming in the southbound lane? A. It was a -- It wasn't no new car but it wasn't no real old one either.

"Q. Was it a large car or a small car? A. It wasn't neither. It was about a medium-size car.

"Q. And the color? A. Blue, I believe.

"Q. When you first perceived the car and first noticed it, it was on the straightaway? A. Yes.

"Q. Could you then describe for us what happened next? A. He just -- when I first really noticed him, he was coming quite fairly fast.

"Q. Could you estimate his speed? A. No, I wouldn't even try because he was coming right straight at me but he's coming fast and that's -- I'm not here to estimate speeds anyway.

"Q. Did you testify what your speed was at this time? A. Yes.

"Q. How fast was that again? A. About twenty-five.

"Q. Was the other car at a comparable rate of speed would you say? A. A lot faster I would say but how much faster I wouldn't know.

"Q. So the car is coming straight down the southbound lane towards you and then what happens? A. He went across the junction there where this compact snow and ice is rutty, got ruts in it kind of, and when he got past, when he crossed the intersection, he started to go like that (indicating).

-4-

"Q. Is he on the straightway at this time?
A. Yes."

The vehicles subsequently collided at the left front bumper of the truck and the left front door of the car. Several witnesses testified they heard two impacts up to five seconds apart. The only evidence of collision debris was found in the southbound (Eslinger's) lane, thus supporting the conclusion of the report and testimony of the Montana Highway Patrol officer that the point of impact was in the southbound lane. Ringsby claims that the debris was from the second collision and that the first collision occurred in the northbound lane. It claims that since investigators were delayed approximately one hour, traffic in the northbound lane around the accident destroyed the physical evidence of the first collision.

Two issues are presented to this Court for review:

1. Whether the giving of a sudden emergency instruction was erroneous under the facts in the instant case, or whether such an instruction should be given under any circumstances.

2. Whether the alleged prior inconsistent statement of the truck driver taken by a highway patrol officer was properly rejected by the court.

The issue of the emergency instruction first concerns the sudden emergency instruction and secondarily the giving of the instruction in conjunction with the statutory instruction on yielding one-half of the roadway.

The given sudden emergency instruction, Instruction No. 18, is as follows:

> "A sudden emergency exists when the driver of
> a motor vehicle is suddenly placed in a
> position of imminent peril, great mental

-5-

stress, or danger, which situation has not been brought about by his own negligence, but in which instant action is necessary to avoid a threatened danger. But the driver must use that care which the ordinary prudent person would exercise under like or similar circumstances. One suddenly confronted with a peril through no fault of his own, who in attempting to escape does not choose the best or safest way should not be held negligent because of such choice, unless it was so hazardous that an ordinary prudent person would not have made [it] under similar circumstances." (Emphasis supplied.)

Appellants claim the District Court further erred by giving the sudden emergency instruction together with the following instruction on yielding one-half of the roadway. Instruction No. 9 provided:

"Under the statutes of the State of Montana, the operator of a motor vehicle is obligated to yield one half of the roadway to oncoming traffic. If the operator of a motor vehicle fails to yield one-half of the roadway and collides with the vehicle proceeding in the opposite direction in its lane of traffic, then the operator of the vehicle failing to yield one half of the roadway is negligent." (Emphasis supplied.)

Appellants contend the two instructions, not being compatible, confused the jury and, thus, prevented a fair trial. Presser v. Anderson (1965), 146 Mont. 396, 407 P.2d 841; Adami v. Murphy (1945), 118 Mont. 172, 164 P.2d 150. Appellants further contend that the sudden emergency instruction is an exception to the general rule that violation of a safety statute is negligence per se. Lyndes v. Scofield (1979), 180 Mont. 177, 589 P.2d 1000, 36 St.Rep. 185; Duchesneau v. Silver Bow County (1971), 158 Mont. 369, 492 P.2d 926. Appellants contend further that the sudden emergency doctrine has a limited application. In the instant case, the evidence did not present an "emergency" situation as envisioned by the doctrine. The slippery

highway was foreseeable; therefore, the doctrine is unavailable. Boge v. Jack Link Truck Line, Inc. (Iowa 1972), 200 N.W.2d 544, 548.

Respondent Ringsby contends that a sudden emergency instruction and a statutory violation instruction do not necessarily conflict, Hood v. Williamson (1972), 7 Wash.App. 355, 499 P.2d 68, and NeSmith v. Bowden (1977), 17 Wash.App. 602, 563 P.2d 1322, and that their theory of the accident (Eslinger crossed the centerline causing an emergency situation) was supported by the evidence presented. Therefore, respondent was entitled to present its theory to the jury by proper instruction. Locker v. Sammons Trucking Company (1974), 10 Wash.App. 899, 520 P.2d 939. The appellants' theory of preexisting negligence by Skiles is not sufficient for excluding a sudden emergency situation. Barbieri v. Jennings (1976), 90 N.M. 83, 559 P.2d 1210. The "emergency" situation was the fishtailing of appellants' car and not the slippery condition of the road. Drivers need not anticipate all events. Erickson v. Perrett (1976), 169 Mont. 167, 545 P.2d 1074. Respondent contends none of the authority cited by appellants address the emergency of an oncoming car in the wrong lane.

The doctrine of sudden emergency was first adopted in Montana in the case of Peabody v. Northern Pac. Railway Co. (1927), 80 Mont. 492, 497, 261 P. 261, 262:

> "The rule as stated in the authorities generally is that:
>
> "'One who, in a sudden emergency, acts according to his best judgment, or who, because of want of time in which to form a judgment omits to act in the most judicious manner, is not chargeable with negligence. Such . . . act or omission . . . may be called a mistake, but not carelessness.'

-7-

(Citations omitted.)"

The sudden emergency doctrine has been recently criticized, and its application limited in a recent decision of this Court. In Kudrna v. Comet Corp. (1977), 175 Mont. 29, 572 P.2d 183, we stated:

"While we do not reject the concept of sudden emergency, we emphasize that it has limited application in the law of negligence, and trial courts should be very cautious in instructing the jury on sudden emergency. In Finley v. Wiley, 103 N.J.Super. 95, 246 A.2d 715 (1968), the court criticized the sudden emergency rule:

"'Further we entertain grave doubt whether a sudden emergency charge should ever be given in an ordinary automobile accident case. There is a modern view that it is argumentative, unnecessary, and confusing, and should be eliminated . . .

"'. . . defendant was faced with no more than an everyday traffic problem for which he should have been prepared. The ordinary rules of negligence were applicable and afforded a sufficient gauge by which to appraise his conduct.'

"Further, this Court in Erickson v. Perrett, 169 Mont. 167, 545 P.2d 1074, 33 St.Rep. 109 (1976) cited Prosser on Torts, 4th ed., p. 170, with approval as to the limited application of the rule:

"'A further qualification [to the sudden emergency rule] which must be made is that some "emergencies" must be anticipated, and the actor must be prepared to meet them when he engages in an activity in which they are likely to arise. Thus under present day traffic conditions, any driver of an automobile must be prepared for the sudden appearance of obstacles in the highway . . .' (Bracketed material added.)" 572 P.2d at 191. (Emphasis supplied.)

Professor Prosser's complete discussion of the emergency doctrine defines an emergency as a "sudden or unexpected event or combination of circumstances which calls for immediate action." Prosser on Torts, 4th ed., at 169. Other limitations not quoted in Kudrna, supra, are:

-8-

"There are, however, a number of limitations which have hedged the 'emergency' rule. It does not mean that any different standard is to be applied in the emergency. The conduct required is still that of a reasonable man under the circumstances, as they would appear to one who was using proper care, and the emergency is only one of the circumstances. An objective standard must still be applied, and the actor's own judgment or impulse is still not the sole criterion. He may still be found to be negligent if, notwithstanding the emergency, his acts are found to be unreasonable. The 'emergency doctrine' is applied only where the situation which arises is sudden and unexpected, and such as to deprive the actor of reasonable opportunity for deliberation and considered decision. Furthermore, it obviously cannot serve to excuse the actor when the emergency has been created through his own negligence, since he cannot be permitted to shield himself behind a situation resulting from his own fault. It is, however, not the conduct after the emergency has arisen which is not excused, but the prior negligence; and where the question is one of the last clear chance, the defendant may still not be liable." (Emphasis supplied.) (Footnotes omitted.) Prosser, supra, at 169.

Before an instruction on the doctrine of sudden emergency is given, the evidence should be sufficient to support a finding that: (1) the claimed emergency actually or apparently existed; (2) the perilous situation was not created or contributed to by the person confronted; (3) alternative courses of action in meeting the emergency were open to such person or there was an opportunity to take some action to avert the threatened casualty; and (4) the action or course taken was such as would or might have been taken by a person of reasonable prudence in the same or similar situation. Annot., 80 A.L.R.2d 1 (1961).

The limited application of the sudden emergency doctrine in automobile cases and the reasons therefor are stated in Kudrna. In the instant case, assuming the "emergency" relied upon by respondent that preceded the

-9-

accident was the fishtailing of the Eslinger vehicle, the evidence cannot be said to preclude the concurrent negligence of the truck driver Skiles, who testified, ". . . I didn't pay that much attention to him until he got within one hundred yards of me."

"This Court has recognized the doctrine of sudden emergency, but a party asserting sudden emergency cannot obtain the benefit of that rule where the emergency itself has been created [or contributed to] by the actor's own negligent or other tortious conduct." Kudrna, 572 P.2d at 189. (The bracketed language reflects the broader rule of other jurisdictions which denotes consideration of comparative negligence principles.)

Further, the doctrine's requirement that the actor be deprived of "reasonable opportunity for deliberation," is doubtful here. The driver of the truck did not "pay that much attention to him [Eslinger] until he got within one hundred yards." The road was snow-covered and slick. Assuming, as respondent argues, that the collision occurred in the northbound lane, its driver was not confronted with a decision precipitated by an emergency. The time between his recognition of the Eslinger vehicle and the collision precluded a decision by him, and, therefore, the doctrine cannot be applied.

The evidence, viewed in a light most favorable to Ringsby (i.e., adopting its theory of the case) refutes Ringsby's claim of the propriety of the instruction. Under the doctrine when an actor who, forced by exigencies, makes less than the optimal decision, the trier of fact should not necessarily find negligence but rather consider the

-10-

emergency and, accordingly, the reasonableness of the actor's conduct. As stated by this Court, the emergency doctrine is a reiteration of the reasonable man standard. However, if no alternatives were available to the truck driver, the instruction, again, was not appropriate. There was no claim here of alternative courses of conduct facing the truck driver following his recognition of the emergency. Consideration being given to all the facts in a light most favorable to respondent, we must agree with appellants that the giving of Instruction No. 18 was prejudicial error.

The sudden emergency doctrine admonition contained in Kudrna, supra, is well taken, and now, in view of this jurisdiction's adoption of the doctrine of comparative negligence, we would at this time admonish the trial courts that the instruction not be given in an ordinary automobile accident case. It is unnecessary and confusing. The ordinary rules of negligence are applicable and afford a sufficient gauge by which to appraise conduct.

This does not create a different standard or diminish the existing standard to be applied in an emergency. The conduct required is still that of a reasonable man under the circumstances as they would appear to one using proper care. The emergency is only one of the circumstances.

Ringsby devotes a substantial portion of its argument to support the proposition that an emergency instruction does not inherently conflict with an instruction on violation of a safety statute. Hood v. Williamson, supra; NeSmith v. Bowden, supra. This proposition is supported by Montana case law as well:

> "The District Court erred in concluding that
> violation of the statute constituted

negligence as a matter of law. It is well
established that involuntary violation of a
statute in an emergency due to circumstances
beyond the actor's control does not
constitute negligence per se. Duchesneau v.
Mack Truck, Inc. (1969), 158 Mont. 369, 377,
492 P.2d 926, 930." Lyndes v. Scofield,
supra, 589 P.2d at 1004.

While the combination of an emergency and negligence
per se instruction is not necessarily error, the
determinative issue in this appeal is a somewhat different
legal issue; i.e., whether the evidence presented justified
acceptance of the instruction as a matter of law.

The appellants finally contend the trial court's
refusal to allow introduction of a statement given by driver
Skiles to the investigating highway patrol officer shortly
after the accident was prejudicial and reversible error.
The evidence was offered as extrinsic evidence of a prior
inconsistent statement. At trial, the Eslingers planned to
impeach Skiles' contention, made in his deposed testimony,
that he had not lost control. In his testimony, Skiles
said:

"I started to pull to the right and I hit my
brakes and I seen that wasn't the right thing
to do so I got right back off them and the
vehicle started to lock up."

The excluded statement made to the patrol officer:

"I then tapped my brakes and saw my vehicle
was starting to skid, so I accelerated in an
attempt to regain control of my vehicle."
(Emphasis supplied.)

Although the officer's report was excluded, the
officer was allowed to testify regarding his interview with
Skiles.

"Q. With respect to Howard Skiles, the
driver of the Ringsby truck, did you inter-
view him immediately after the accident? A.
Approximately two hours after the accident.

-12-

"Q. This was in St. Ignatius, was it? A. Yes, sir.

"Q. He was taken there, I believe, for medical attention, and you interviewed him at that time? A. Yes, I did.

"Q. Did he tell you that when the Eslinger car came off the hill it fishtailed, and that he hit his brakes? A. Yes, he did.

"Q. Did he tell you that then the trailer on his truck started to come around on him? A. Yes, he did.

"Q. Did he tell you that he lost control of his truck? A. Yes, he did." (Emphasis supplied.)

The testimony of the patrol officer provided substantially the same evidence as the excluded statement and the exclusion of the exhibit was harmless error. Rule 61, M.R.Civ.P. This is probably more true in this cause because the driver was not present in court and all testimony was by deposition. Further, ". . . error cannot be predicated upon the exclusion of evidence at one stage of a trial, if the same evidence is admitted thereafter." State v. American Bank & Trust Co. (1926), 75 Mont. 369, 384, 243 P. 1093, 1098. See also Kraft v. Pattyn (1959), 135 Mont. 572, 342 P.2d 1063.

The judgment of the District Court is reversed, and the cause is remanded for a new trial.

_____
Justice

-13-

We concur:

_____
Chief Justice


_____

_____

_John le Shuby_____

_____
Justices

_John M. McCarvel_____
Honorable John M. McCarvel,
District Judge, sitting in
place of Mr. Justice Frank B.
Morrison, Jr.

Mr. Justice Daniel J. Shea concurring:

I agree that the sudden emergency instruction should not have been given, that it was prejudicial, and therefore that a new trial should be granted. I further agree that it is time for the demise of the sudden-emergency instruction in any situation. General instructions on negligence are fully capable of properly instructing the jury. I want to emphasize, however, a factor that has not been mentioned in the majority opinion--the defendant argued the sudden emergency to the jury and therefore the defendant is not now in a position to contend that the instruction was harmless.

At the pretrial hearing, the plaintiffs had no idea that the defendant would rely on a sudden emergency as at least one of the theories exonerating it from liability. This theory was first presented by the defendant at the end of the case during the settlement of instructions. The instruction was given over the plaintiffs' objection.

Although it was not argued in the briefs, the defendant truck lines argued at the hearing of this appeal, that, in any event, the sudden emergency instruction was harmless error. This argument was based on the underlying contention that each side approached the case knowing that the case would turn on which of the vehicles was on the wrong side of the road at the time of impact. If the plaintiffs' vehicle was in the northbound lane of the defendant's truck, the defendant truck lines would prevail. But if the defendant's truck was in the southbound lane of the plaintiffs' at the time of the impact, the plaintiffs would prevail. For this reason, the defendant truck lines argued that the sudden emergency instruction was harmless error because the jury must have found that the

-15-

plaintiffs' vehicle was in the northbound lane of the defendant's truck at the time of impact.

But during the final arguments to the jury, defendant's counsel did not downgrade the application and effect of the sudden emergency instruction. Rather, he emphasized to the jury that it would probably be a vital aid in helping the jury reach a decision.

Counsel used the sudden emergency instruction as follows in his final argument:

> ". . . There has been no testimony by anyone in this case that that truck was traveling anything other than a slow, careful speed until a sudden emergency. I'm going to ask that you go to the jury and read the instruction on sudden emergency, because I'm not going to talk about it. You read it, and you apply that instruction to the facts of this case." (Emphasis added.)

Although defense counsel did not again mention the instruction, the entire case based on the deposition of the truck driver read into evidence, and in part read again to the jury by defense counsel in final argument, was that the conduct of the truck driver should be judged by the fact that he took action in an emergency situation. Obviously the defense wanted the jury to judge the truck driver's conduct based first on the fact that he had responded to an emergency situation.

We do not, of course, know how the jury reached its verdict. But the jury could have decided that the truck was in the wrong lane of traffic at the time of impact, but also that the defendant should not be held liable because the truck driver had responded to an emergency situation and in so doing he could not control the movement of his truck after he applied his brakes. Or it is possible that a part of the jury decided the case on the theory that the plaintiffs'

vehicle was in the wrong lane of traffic but that the remainder of the jurors needed for a verdict, based their decision on an emergency situation justifying the truck driver being in the wrong lane of traffic at the time of impact. They could have based their decision on the sudden emergency instruction.

Under these circumstances, I cannot accept the defendant truck line's argument that the instruction, if error, was harmless.

_Daniel J. Shea_
Justice

Mr. Justice Fred J. Weber dissenting:

I respectfully dissent.

The majority opinion sets forth the full text of Instruction No. 18, which is the sudden emergency instruction given in this case. It should be noted that this instruction is a duplicate of the sudden emergency instruction given in Dawe v. Dalley (1972), 161 Mont. 73, 504 P.2d 982. In the Dawe case, the Dalley car had followed the Dawe vehicle for approximately three-quarters of a mile up the north side of Boulder Hill on Highway 91 in Jefferson County. The Dawe car was observed to have difficulty negotiating the hill and was fishtailing. When the car started down the south side, they were traveling no faster than 15 miles per hour, with Dalley testifying he was trying to keep 50-75 feet behind the Dawe vehicle. Upon reaching a sharp curve the Dawe vehicle went out of control with front wheels colliding with a snowbank and the rear end sliding around. At this point Dalley tried to turn to the left but was unable to do so because of oncoming traffic. He then applied brakes and slid into the Dawe vehicle. Based upon these facts, this Court in a unanimous decision agreed that it was proper to give the sudden emergency instruction. The Court stated:

> "'We are also of the opinion that the court did not err in instructing the jury with reference to the emergency doctrine. An instruction on this theory should always be given where it is consistent with the theory of one of the parties to the action and where the evidence submitted by such party would sustain a finding that he had been confronted with a sudden peril or emergency and acted under its stress.'" 161 Mont. at 76, 504 P.2d at 984.

The Court further quoted from the Montana rules stated in Peabody v. Northern Pac. Ry. Co. (1927), 80 Mont. 492, 498, 261 P. 261, 262:

"'If the evidence in this case were sufficient to warrant a reasonable conclusion that at the time in question the defendant . . . was confronted with a "sudden emergency," or that "there was want of time in which to form a judgment", under the circumstances, as they appeared to him, the court should have given the offered instructions.' Emphasis supplied." 161 Mont. at 76, 504 P.2d at 984.

At the time of the trial of the present case, the holding in Dawe had not been modified or overturned. No specific reference is made to this case in the majority opinion.

The majority opinion makes an extensive reference to the Kudrna case. It should be noted that the quoted portions of that case are essentially dicta. In Kudrna this Court found that the doctrine of sudden emergency could not be applied because the truck driver had created his own emergency by his own negligent acts.

Following the quotation from Kudrna and Prosser the majority opinion refers to the annotation in 80 ALR 2d 1 and points out that before the instruction on the doctrine of sudden emergency is given, the evidence should be sufficient to support a finding that (1) the claimed emergency actually or apparently existed; (2) the apparent situation was not created or contributed to by the person confronted; (3) alternative courses of action in meeting the emergency were open to such person or there was an opportunity to take some action to avert the threatened casualty; (4) the action or course taken was such as would or might have been taken by a person of reasonable prudence in the same or similar situation. The majority then seeks to apply the facts to the foregoing rules and arrives at a conclusion that the instruction was improper.

We respectfully submit that there has been a failure on the part of the majority to accurately analyze the facts in the present case. The evidence on the point of impact of the vehicles is in direct conflict. The majority opinion makes reference to the evidence of collision debris in the southbound lane of traffic and the testimony of the highway patrol officer that the point of impact was in the southbound lane, that being the lane of the plaintiffs' car. That evidence is certainly significant and is unfavorable to the defendant. However, it should be noted that there is extensive evidence contradicting the patrolman's conclusion as to the point of impact. In a similar manner, there is extensive testimony which positively states that the plaintiffs' car made two complete spins on the icy highway, fishtailed back and forth, and slid sideways across from its own lane of traffic into the lane of traffic of the northbound truck, colliding with the truck in the northbound lane of traffic. The accident occurred in the town of Ravalli in an area posted for 45 miles per hour travel. The evidence indicates the truck was driving north at 25-35 miles per hour and that the plaintiffs' car was driving south down Ravalli Hill at a speed of 35 miles per hour or possibly faster. That evidence shows that the sudden emergency so far as the truck driver was concerned was the sliding sideways across into his traffic lane of the Eslinger car.

Mark Fitch, 40 years of age, with 22 years of driving experience, was seated in the Bison Cafe, which is next to the highway and adjacent to the point of collision. Key parts of Mr. Fitch's testimony are:

> "A. Well, the car (Eslinger car) was headed south, coming off of Ravalli Hill, and when it got close to the intersection of 200 at

the foot of the hill, it seemed to start
fishtailing out of control and started two
clockwise spins still heading south.

"   . . .

"Q.   How fast was the blue car (Eslinger car)
traveling as it approached the intersection
heading toward Thompson Falls?

"A.   I would guess between thirty - thirty-
five miles an hour.

"Q.   You indicated that it started to fishtail;
is that right?

"A.   Yes.

"Q.   Can you tell the jury in your own words
what your conception of a fishtailing maneuver
is?

"A.   The back end trying to pass the front end.

"Q.   What did you do when you saw it attempting
to fishtail?

"A.   Well, I watched it go into a couple of
clockwise spins, and then I immediately looked
south, because my wife was supposed to meet me.

"Q.   Why is it that you looked south?

"A.   She drives a Chevrolet Chevette, and I
was concerned she may be the next car in line.

"   . . .

"Q.   Based upon your twenty-two years of driv-
ing experience, was the blue car in control
as it proceeded from the Thompson Falls inter-
section southerly?

"A.   No.

"   . . .

"Q.   As you looked southerly towards the
direction to which you thought your wife was
approaching, did you have the opportunity to
see any other vehicle?

"A.   Yes, there was a truck approaching headed
north.

"Q.   Could you tell, based upon your observa-
tion of that truck at that place and time, how
fast it was traveling?

"A.   I would guess approximately thirty - thirty-
five miles an hour.

"Q. At the time you saw the truck, which lane of traffic was it in, the right lane. Excuse me, strike that.

"Was it in the northbound lane or the south-bound lane?

"A. It was in the northbound lane.

"Q. Had you driven that particular roadway before?

"A. Many times.

"Q. Were you familiar with where the snow berms were on the side and where the center-line was underneath the snowpack?

"A. Yes.

"Q. As the truck proceeded further northerly, did it stay in the northbound lane?

"A. Yes, it did.

"Q. Mr. Fitch, I'll ask some more specific questions later, but will you tell this jury in your own words exactly what you saw as the truck and the car approached each other.

"A. Just a little bit south of what used to be the Texaco station there the truck was in the northbound lane, and the car seemed to be starting into another spin and was sitting crossways in the northbound lane, at which time the truck contacted it at about the passenger or the driver's door, which would be the left side, with the left front corner of the vehicle, truck, and proceeded to shove it back up the highway, I would guess a hundred - hundred and fifty feet. First contact the truck immediately -- the tractor jackknifed, made contact about a hundred feet - a hundred fifty feet up the road, at which time it hit the right side of the truck, still hitting the driver's side of the car, shoving it off to the west of the highway, and the trailer then continued to spin around and slide off to the west side of the highway.

"Q. Mr. Fitch, when the first contact was made between the car and the truck, was the truck in the northbound lane or in the south-bound lane?

"A. Was in the northbound lane.

"Q. When the car first made contact with the truck, was it in the northbound lane or in the southbound lane?

"A. Mostly in the northbound lane.

-22-

"Q. Was the car at that particular point in
time with its nose headed south, or was it
sideways?

"A. A little sideways, still primarily headed
south.

". . .

"Q. Did you, from where you were seated, hear
these various impacts that took place?

"A. Yes, I did.

"Q. Did you hear the first impact when you saw
it take place?

"A. Yes.

"Q. Approximately how many seconds elapsed
before the second impact took place?

"A. Five, three, four, five seconds, very
short period of time.

"Q. Approximately five seconds?

"A. Approximately.

"Q. Can you describe to the jury what happened
to the car at the time of the first impact?

"A. Yes, it was shoved back up the highway,
that would be north, which it went a little
bit to the southbound lane, and on the second
impact then it took place in the southbound
lane."

Virginia Butler, who had lived in the Ravalli area for
37 years and been driving a car for 20 years, also testified.
She also was seated next to a window in the Bison Cafe,
directly opposite the point of collision. She testified at
length as to her observations of both vehicles. She confirmed
that the Eslinger car was going virtually sideways on the
highway. She testified that the car was traveling faster
than the truck. She further confirmed that the truck was in
its correct lane, that being the northbound lane, and that
just prior to the impact, the car was in the wrong lane,
that being the northbound lane as well. She also confirmed
that she heard two loud noises, with the second noise being

several seconds after the first. She testified that the truck ended up swerving around after the collision and itself heading south.

Howard Skiles, driver of the truck testified as mentioned in the majority opinion. He testified to the application of brakes on the truck and trailer, which resulted in a sliding or locking, after which he released such brakes. It was this application of brakes which the defendant contends was the action on the part of the truck driver which was justified because of the sudden emergency. In pertinent part Skiles testified:

"A. I started to pull to the right and I hit my brakes and I seen that wasn't the right thing to do so I got right back off them and the vehicle started to lock up.

"Q. What happened when you hit your brakes?

"A. It started to lock up.

"Q. And what occurred when it started to lock up?

"A. It started to slide and I immediately let off.

"Q. What direction did it start to slide?

"A. Just down the street.

"Q. Was it going straight?

"A. Fairly straight, yes.

"Q. In what position was the trailer at this point?

"A. It was behind me.

"Q. Did the trailer start to come forward?

"A. No, I let off on the brakes before they had a chance. I just barely tapped them.

"Q. You tapped the brakes, you felt the vehicle lock up -- I think that's the term you used -- and slide. You went into a skid.

"A. Started to.

"Q. Then what happened?

-24-

"A. I let off the brakes, looked back and he started to fishtail and he turned about half sideways and he was coming right at me.

"Q. Where was your vehicle at this time and this is just before the impact?

"A. Well, there is no way for me to really -- The vehicle itself, mine was -- It was well over in my lane at the time of impact.

"Q. Your vehicle was in the northbound lane at the time of the impact?

"A. Yes.

"Q. Did it ever slide over to the southbound lane?

"A. That street is plowed real wide right there. That must be over seventy feet of street right there but it was way over on my side.

". . .

"Q. Did you ever cross the centerline?

"A. No."

Officer Magone did testify as follows with regard to the point of impact:

"Q. Is there any question in your mind, officer, about where the impact of this accident occurred?

"A. No, sir.

"Q. And it occurred, as you said, in the south-bound lane, close to the west edge, I think you said of the asphalt?

"A. It is difficult to tell exactly where the edge of the lane was, but it was on the west side, yes, in the southbound lane; kind of hard to tell right where the lane is there due to the snow cover, but from the centerline over to this point we would put it on the edge of the lane."

Reviewing the evidence in the light most favorable to the defendant, as required, we would hold that the findings required under the annotation from 80 ALR 2d. 1, cited in the majority opinion have been met:

1) The claimed emergency which actually existed was the sliding of the Eslinger car sideways into the truck's

-25-

lane of traffic.

2) The perilous situation was not created by the truck driver - the truck driver testified "I seen him coming down the hill before he ever got to the junction. I didn't pay that much attention to him until he got within 100 yards of me." The majority has suggested this is an indication of negligence. That cannot be implied where the evidence shows that he was driving at 25-35 miles per hour. Note there is no other evidence showing negligence on the part of the truck driver with the exception of the reference to the point of collision by the evidence of the highway patrolman.

3) Alternative courses of action in meeting the emergency were open to the truck driver - clearly it made sense for him to turn right and apply the brakes as he did.

4) The action taken was such as might have been taken by a person of reasonable prudence in the same or similar situations - this seems to have been an entirely appropriate course of action to be taken by a reasonably prudent person. While the application of the brakes did cause some locking and possibly sliding, the immediate release of the brakes allowed the truck and trailers to remain in the proper lane.

Our case is directly comparable to Hood v. Williamson (1972), 7 Wash. App. 355, 499 P.2d 68. In the Hood case, there was a head-on collision where the occupants of the vehicles were both killed and there was conflicting evidence concerning the lane in which the collision occurred. With regard to the emergency instruction similar to the instruction here given, the court stated:

> "An emergency instruction is properly
> applied on behalf of the driver of a car
> on its own side of the road, when confront-
> ed with a car on the wrong side of the

road. [Citation omitted.]   There was substantial evidence to justify giving the emergency instruction on behalf of both plaintiff and defendant."   499 P.2d at 72.

In the fact situation of the present case, the emergency instruction could be applicable to both the plaintiffs' and defendant's side of the case.   The plaintiffs could have argued that the application of the brakes, locking of the wheels, and sliding of the truck was an emergency which required a response on the part of the Eslingers.   On the other hand, as argued by the defendant, the sideways sliding of the Eslinger vehicle into the wrong traffic lane clearly required an emergency response by the truck driver.

We find that both plaintiffs and defendant were represented by very competent counsel, and presented all of the evidence available in behalf of each side.   There were striking conflicts in the evidence.   After due consideration, the jury found that the negligence of the Eslingers was 100% of the cause of the accident, and that there was no negligence on the part of the truck driver.   We would affirm the judgment of the lower court.

_____
Justice

We concur in the above dissent:

_____
Chief Justice

_____
Justice

-27-